Filed 11/20/24 (unmodified opn. attached)

CERTIFIED FOR PARTIAL PUBLICATION*

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>FREDDY RIVERA CORBI,<br><br>    Defendant and Appellant. | D081490<br><br>(Super. Ct. No. SCD283353)<br><br>ORDER MODIFYING OPINION AND DENYING REHEARING<br><br>NO CHANGE IN JUDGMENT |

THE COURT:

It is ordered that the opinion filed October 25, 2024 be modified at the paragraph commencing on the bottom of page 34 that begins with "In his reply brief" and ending at the top of page 35 with "by means of a habeas petition" to read as follows:

> Although his opening brief acknowledged the *Lashon* forfeiture rule and urged this court not to follow it, Corbi argues for the first time in his reply brief that if the RJA claim was forfeited, his trial counsel rendered ineffective assistance by failing to specifically raise it. "It is rarely appropriate," however, "to resolve an ineffective assistance claim on direct appeal" and as a matter of fairness "we certainly will not do so where, as here, the claim is omitted

---

* Pursuant to California Rules of Court, rule 8.1110, this opinion is certified for publication with the exception of parts A and C of the discussion.

from the opening brief and thus waived." (*People v. Duff* (2014) 58 Cal.4th 527, 550, fn. 9.)  In any event, claims of ineffective assistance of counsel are more appropriately raised on habeas corpus.  (*People v. Mendoza Tello* (1997) 15 Cal.4th 264 266–267.)  We express no opinion on whether Corbi should pursue his claim(s) by means of a habeas petition.

The petition for rehearing is denied.

There is no change in judgment.

O'ROURKE, Acting P. J.

Copies to:  All parties

Filed 10/25/24 (unmodified opinion)

CERTIFIED FOR PARTIAL PUBLICATION[*]

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>FREDDY RIVERA CORBI,<br><br>    Defendant and Appellant. | D081490<br><br><br><br>(Super. Ct. No. SCD283353) |

APPEAL from a judgment of the Superior Court of San Diego County, Runston G. Maino, Judge. Affirmed.

Alex Kreit, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Eric A. Swenson, Marvin E. Mizell and Christine Y. Friedman, Deputy Attorneys General, for Plaintiff and Respondent.

---

[*] Pursuant to California Rules of Court, rule 8.1110, this opinion is certified for publication with the exception of parts A and C of the discussion.

Appellant Freddy Rivera Corbi was bullied by gang members in his community for years.  In the summer of 2019, a gang member stabbed him in the wrist with a broken beer bottle, causing serious injuries.  A month later, Corbi ran into another member of that same gang, Lazaro Orozco.  The encounter turned into an argument that ended with Corbi fatally shooting Orozco.  At trial, the main issue was whether the shooting was self-defense, or whether Corbi actually belonged to a rival gang and killed Orozco as an act of revenge.  Ultimately, the jury convicted Corbi of second degree murder.

On appeal, Corbi argues the trial court abused its discretion in allowing the prosecution's gang expert to offer certain opinions on the significance of Corbi following Orozco before the shooting.  He further asserts that the prosecutor violated the California Racial Justice Act of 2020 during closing arguments by repeatedly highlighting one of Corbi's Facebook posts indicating his interest in white women.  He claims the court erred in considering whether to dismiss a firearm enhancement at sentencing as well.  For reasons we will explain below, we see no reversible error or reason to remand this case for resentencing and, accordingly, affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

As a child growing up, Corbi moved around often.  Towards the end of his childhood, his family lived in a neighborhood with high gang activity.  He got "banged a lot" in high school, meaning a group of five or six gang members would ask him where he was from, he would say, "Nowhere," and then they would stomp on him and beat him.  This happened so often that he became afraid to go to school and dropped out after ninth grade.  Even so, he continued to get "banged on" in his neighborhood.  He was attacked with screwdrivers, bats, and knives.

In the summer of 2019, Corbi was 20 years old. That Fourth of July, he was at a local park celebrating when a group of three Eastside San Diego (ESD) gang members approached him. One of them was holding a glass beer bottle and asked Corbi where he was from. When he said, "Nowhere," the ESD member broke the bottle and thrust it towards Corbi's face and neck. Corbi raised his hand defensively and the bottle stuck inside his wrist, causing serious injuries. Following this incident, he started carrying a gun to protect himself.

The shooting in question occurred about one month later. At around 2:30 in the afternoon, Corbi was walking to get something to eat. His arm was still in a cast from the stabbing. What happened next was recorded by a "smart" streetlight camera positioned nearby.

The video showed Corbi encountering Orozco near an intersection. Orozco was holding his shirt in his hand, revealing ESD tattoos all over his torso, neck, and face. Orozco raised his arm and approached Corbi. Although the video lacked sound, it looked as though they were arguing. Orozco continued raising his arm and making gestures with his hands.

Corbi and Orozco began to walk away from each other, then Orozco turned around and said something to Corbi. Orozco resumed walking away, but Corbi turned and followed Orozco around the corner of the city block. As Corbi followed, his right hand moved toward his midline, and he looked back and forth. Roughly 15 seconds later, Orozco disappeared into "a little alcove" at the entrance to a building, outside the camera's view. He looked back towards Corbi just before entering the alcove.

When Orozco reemerged, he no longer had his shirt in his hand. As Corbi stood on the sidewalk just outside the alcove, Orozco walked in an arc around him toward the street. He raised his hands, made more gestures,

3

and puffed out his chest, apparently challenging Corbi to a fight. Corbi fired several shots and Orozco fell into the street. Corbi immediately ran away, shooting again as he passed Orozco and then hiding his jacket and his gun in a nearby alleyway.

Despite receiving prompt medical attention, Orozco died of multiple gunshot wounds to the front of his neck, his left shoulder and lung, his right forearm, and his lower back. He had methamphetamine, marijuana, and fentanyl in his system at the time of his death. No weapons were found on his person or at the scene.

About three weeks later, the police received a Crime Stoppers Tip identifying Corbi as the shooter. The tipster said that Corbi had made a new Facebook profile under the username "QK Mobb." The lead detective on the case looked up the profile and discovered it was public, meaning anyone could review it. He noticed that the profile was created after the shooting, and at some point, the username was changed to "QK MDLS Adams Avenue." He also saw several photos of Corbi on the profile, including two that had been posted earlier that day. In one photo, Corbi is making the shape of a gun with his hand. The photo is captioned: "Where my CheexSers hoexs at?"

The lead detective obtained a warrant to search the Facebook account further. He discovered private messages sent from the account indicating that Corbi had been in Mexico since the shooting, but had recently returned to San Diego. The police arrested Corbi near his home shortly thereafter.

The prosecution charged Corbi with murder (Pen. Code,[1] § 187, subd. (a)) and alleged that he personally and intentionally discharged a firearm causing great bodily injury and death (§ 12022.53, subd. (d)). At trial, the prosecutor pursued first degree murder on a theory of premeditation and

---

[1] Further undesignated statutory references are to the Penal Code.

deliberation.  Specifically, he theorized that Corbi belonged to a rival gang called Mexican Demon Lokos (MDLS) and shooting Orozco was an act of retaliation for the Fourth of July stabbing.

Detective Doru Hansel testified as a gang expert for the prosecution. The gangs he focuses on include ESD and MDLS.  Hansel explained that ESD has existed since the 1960's or 70's and is one of the largest gangs in town with about 170 active members.  Hansel confirmed that Orozco was an ESD member.  He identified Orozco's tattoos, including "ESD" above his right eye, an "E" and "S" on his right cheek, and "Eastside" along his lower torso.

MDLS started in the 1990's and its membership is "extremely low" with less than 10 active members.  Adams Avenue is a significant street for MDLS, and the members sometimes call themselves "Calle Adams Boys." Looking at some pictures of Corbi, Hansel opined that a "C" and "A" tattoo on his chest symbolized "Calle Adams."  Hansel further opined that Corbi making the letters "M" and "D" with his hands indicates MDLS membership, or at least a desire to join MDLS.

Regarding the Facebook evidence, Hansel explained that calling an ESD member a "quesero" or "cheeser" was an extremely disrespectful insult. Since "QK" can mean "Queso Killer," Hansel interpreted Corbi's username— "QK MDLS Adams Avenue"—to mean "I killed an Eastsider or I'm willing to kill an Eastsider, ready to kill an Eastsider, and I'm from MDLS."  The photo captioned with the phrase "CheexSers hoexs" was a derogatory callout to ESD members, with the inserted "x" letters symbolizing crossing out ESD graffiti.  In Hansel's opinion, the fact that the profile was public meant that Corbi was proud and unafraid.

Hansel confirmed that the shooting in this case took place in ESD territory.  According to Hansel, simply walking through ESD turf as a rival

gang member is disrespectful.  "If you plan to go into rival territory," he explained, "you better be armed.  It's common knowledge you're not just going to go into somebody's turf as a rival."  And if somebody "hits you up," you must be ready to go.  When a gang member asks—"Where are you from?"— it is a challenge and can be a precursor to violence.

Generally, Hansel testified, if someone is attacked by a certain gang, and the gang catches that person on their turf again, they would be a target and their life could possibly be in danger.  If that person was part of a rival gang, they would be "looking for trouble" by returning to that turf.  Considering a hypothetical wherein Gang A attacks a member of Gang B, then one month later the Gang B member ventures into Gang A territory, Hansel opined that the Gang B member was brazen and unafraid.  Bringing a gun into that scenario means, "I'm ready to get down."  As discussed in more detail below, Hansel watched the streetlight video and gave his opinion on the encounter between Corbi and Orozco as well.

The defense at trial was self-defense.  Corbi testified that he had never seen Orozco before.  When they crossed paths, Orozco caught his attention by saying, "Hey," and raising his hand.  Orozco then asked where he was from.  He said, "Nowhere."  Orozco asked again.  At this point, he noticed that Orozco "looked high" because he was "twitching a lot" and his pupils were dilating.  He was big, muscular, and had tattoos all over his body.  Corbi felt afraid and thought he was going to be killed.

Orozco asked Corbi to follow him.  Corbi started to walk away, but decided he "couldn't" keep walking away.  He thought that if he ran, he could be hit by a car, or Orozco could catch him, tackle him, pull out a gun, and kill him.  So he followed Orozco, and he took out his gun in case Orozco "attacked" him or "pushed" him.  As he followed, he looked around for

6

additional gang members because, in his experience, they attacked in a group.

When Orozco reached the alcove, he put his tank top down, which signaled to Corbi that he was ready to fight or kill. Corbi did not see any weapons, but he thought Orozco might have a screwdriver or a knife in his boxer shorts. When Orozco walked towards the street and raised his hands, Corbi thought he was going to attack, so he shot him. Corbi elaborated: "He just looked – he looked scary. He took, like, a step forward towards me with his hands up. He would have tackled me down, dropped me, [felt] the gun, he would have shot me."

After the shooting, Corbi went to stay with his older sister in Mexico, as he often did. Although he felt terrible about the shooting, he started claiming MDLS, derogating ESD, and bragging about the killing on Facebook, hoping this would convince ESD members to leave him alone. He denied that he was a member of MDLS before or at the time of the shooting. He said his "CA" tattoo simply stood for "California."

In support of the defense, forensic psychologist Dr. Kristina Malek testified regarding Corbi's cognitive abilities and mental health. Upon evaluating Corbi before trial, Dr. Malek determined that Corbi has a mild intellectual disability and "pretty extensive trauma." Aside from the Fourth of July attack, he suffered child abuse, child neglect, community violence, and extreme poverty. As a result, he exhibits some symptoms of PTSD, including hypervigilance. Moreover, because he was only 20 years old at the time of the shooting, his brain was not yet fully developed. At this age, the "reward system" part of the brain is "only loosely connected" to the decisionmaking part, which causes youths to seek out high-risk, high-reward experiences while ignoring the potential consequences. They are less able to problem

7

solve in stressful situations as well. This can be exacerbated by intellectual disability and trauma.

Dr. Malek agreed that Corbi's learning impairment, the immaturity of his brain, and his past trauma could all affect how he handled the incident in question. She believed he "would be in a heightened state of arousal" when asked where he was from, especially considering that he perceived Orozco as large and intimidating. Although individuals who have experienced repeated trauma "tend to overrespond in stressful situations" or "misinterpret cues as being more dangerous than what they actually are," Dr. Malek opined that, in this particular case, Corbi's flight-or-fight response and fear were legitimate.

The defense also presented the testimony of their own gang expert, Adam Mortera  Mortera is a reformed gang member who develops and facilitates rehabilitative programs throughout the state prison system. He explained that gangs recruit in schools within their turf. If someone is not interested in joining, the gang could target that person for bullying, harassment, and even assault.

Similar to Hansel, Mortera testified that the question "where are you from" is "step one in gang confrontation" and could lead to an assault or possibly death. If the person asking the question is "staring you down" and appears to be under the influence, Mortera opined that person is probably looking for a confrontation.

Mortera also explained that because "gang culture is all mainly retaliation and ego or image," if a gang attacks someone, they would expect the victim to retaliate. In anticipation of that, the gang would continue to target the victim "to keep them on the defensive." And once someone is attacked, the levels of threat and violence "[a]bsolutely" continue to escalate.

8

Mortera agreed that a nonmember might engage in gang-like behavior after an incident like the shooting in order to gain protection. A nonmember might begin associating with rival gang members, get tattoos like them, and brag about the killing. They might use derogatory terms as a way of saying, "keep messing with me and you're going to get what the last person got." Hypothetically, if someone killed an ESD member and then posted on Facebook that they were a "Queso Killer," Mortera opined this could communicate bravado and fearlessness.

Watching the smart streetlight video, Mortera testified that it was possible Corbi was afraid when he followed Orozco. He clarified: "[I]f Mr. Corbi thought that this person was going to attack him, walking away, even distancing yourself is fruitless. It's irrelevant. The person is going to get you. If that's what you really believe, then walking back isn't out of what you would think would be considered normal. Especially for someone who is claiming to be fearful."

Consistent with Hansel, Mortera believed an average gang member who was followed as Orozco was followed would "[g]et ready to fight." Indeed, just before the shooting, he recognized that Orozco was "moving his arms around" and "getting ready to square up and fight." Although Mortera knew Orozco was unarmed, he concurred that gang members often hide weapons in their boxer shorts.

Ultimately, the jury convicted Corbi of second degree murder and found true the firearm allegation (§ 12022.53, subd. (d)). At sentencing, the trial court granted the defense's motion to impose a lesser firearm enhancement (*id.*, subd. (b)) and accordingly sentenced Corbi to 15 years to life for the murder, consecutive to 10 years for the reduced firearm enhancement.

9

## DISCUSSION

### A. *There is no prejudicial error regarding the expert testimony.*

Corbi contends the trial court abused its discretion by allowing the prosecution's gang expert, Detective Hansel, to opine that he followed Orozco because "something pissed him off" and that, by following Orozco in his own gang territory, he started a quarrel with him. Corbi argues this testimony was speculative, unhelpful to the jury, and invaded the role of the jury to decide whether he in fact started a quarrel. Corbi asserts the error was prejudicial because the challenged testimony frustrated his claims of self-defense and imperfect self-defense.

#### 1. *Additional Background*

The prosecution asked Hansel to give his opinion on the smart streetlight video. After watching the beginning of the video showing Corbi and Orozco arguing, Hansel testified that he believed he saw Orozco "thr[o]w up an Eastside" with his hands, which would mean, "I'm from Eastside. This is my turf. You better get going."

The prosecutor played a few more seconds of the video, then asked, "What is the significance of the defendant who we've talked about his ties to MDLS following Orozco?" Hansel answered:

> "I personally found that strange because why would you follow an Eastsider in Eastside territory. And what's going to come out of it isn't good. That's the heart of Eastside. You're going to follow an Eastsider on his own turf? *I think something pissed him off, and he decided to follow.* You can see Orozco has completely turned away." (Italics added.)

Defense counsel objected, citing "speculation," and asked the trial court to strike the answer. The court overruled the objection, explaining: "This is an expert opinion. [¶] You'll get an instruction on expert opinion. You can

10

believe some of it, all of it, none of it.  Give it some weight, no weight, whatever you wish."

Assuming that Orozco had, in fact, flashed an ESD gang sign at Corbi, Hansel opined that following Orozco was inconsistent with someone living in fear of ESD.  The prosecutor then posed this hypothetical:

> "Now, I'd like for you to think about a situation where an Eastside gang member in Eastside territory has confronted another individual and has walked away from them, and that individual follows him.  What would an Eastside gang member, based on your training and experience, do in a situation like this?"

Hansel opined that the ESD member "would have to address that." The prosecutor then asked, "Would you say that someone in the position of the defendant is starting a quarrel with an Eastsider in Eastsider territory?" Hansel agreed:  "It kind of looks like it."

At this point, defense counsel again objected based on speculation. The court responded, "Same ruling as before about expert testimony."  The prosecutor and Hansel explored this point a bit further.

> "[Prosecutor]:  Would you say engaging an Eastsider in Eastside territory by following them is a show of disrespect?
>
> "[Hansel]:  Yes, sir.
>
> "[Prosecutor]:  And how would one expect an Eastsider to respond?
>
> "[Hansel]:  It would be a confrontation.
>
> "[Prosecutor]:  *Would you agree in this situation that the defendant has started a quarrel with Orozco?*
>
> "[Hansel]:  Yes, sir."  (Italics added.)

Defense counsel did not object again.

11

2.    *We will address Corbi's arguments on the merits.*

As an initial matter, the Attorney General asserts that Corbi forfeited his claims that Hansel's testimony was unhelpful to the jury and usurped the role of the jury because his trial counsel only cited "speculation" as the basis for her objections.  In reply, Corbi maintains that his counsel's objections were sufficient because they apprised the court of what it was being called upon to decide—namely, whether Hansel could opine on his state of mind. We tend to think otherwise, as the issue of speculation concerns what an expert opinion is *based on* (see Evid. Code, § 801, subd. (b)) whereas an argument that an opinion is unhelpful or invasive focuses on the *contents* of the testimony (*id.*, subd. (a)).  (See *People v. Scott* (1978) 21 Cal.3d 284, 290 ["An objection is sufficient if it fairly apprises the trial court of the issue it is being called upon to decide"].)  Anticipating an issue of forfeiture, Corbi alternatively contended in his opening brief that trial counsel rendered ineffective assistance by failing to object on all three grounds.  (See generally *Strickland v. Washington* (1984) 466 U.S. 668, 686–688.)  The Attorney General's only contrary argument is that the "claim fails because . . . the challenged testimony was not improper, and even if the testimony should not have been permitted, the error was harmless beyond a reasonable doubt." Since the Attorney General essentially skips to the merits of the underlying claim, we will do so as well and consider Corbi's arguments in full. (See *People v. Monroe* (2022) 85 Cal.App.5th 393, 400.)

3.    *Detective Hansel exceeded the proper scope of expert testimony, but there is no reasonable probability this affected the outcome in this case.*

"While lay witnesses are allowed to testify only about matters within their personal knowledge (Evid. Code, § 702, subd. (a)), expert witnesses are given greater latitude.  'A person is qualified to testify as an expert if he [or

12

she] has special knowledge, skill, experience, training, or education sufficient to qualify him [or her] as an expert on the subject to which his [or her] testimony relates.' (Evid. Code, § 720, subd. (a).)  An expert may express an opinion on 'a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact.' (Evid. Code, § 801, subd. (a).)" (*People v. Sanchez* (2016) 63 Cal.4th 665, 675.)  "The jury need not be wholly ignorant of the subject matter of the opinion in order to justify its admission; if that were the test, little expert opinion testimony would ever be heard.  Instead, [Evidence Code section 801, subdivision (a)] declares that even if the jury has some knowledge of the matter, expert opinion may be admitted whenever it would 'assist' the jury.  It will be excluded only when it would add nothing at all to the jury's common fund of information, i.e., when 'the subject of inquiry is one of such common knowledge that [people] of ordinary education could reach a conclusion as intelligently as the witness'." (*People v. McDonald* (1984) 37 Cal.3d 351, 367.)

Expert opinion "is not objectionable [simply] because it embraces the ultimate issue to be decided by the trier of fact." (Evid. Code, § 805.)  Indeed, such testimony "often goes to the ultimate issue in the case." (*People v. Torres* (1995) 33 Cal.App.4th 37, 47.)  The touchstone remains whether the opinion would be helpful to the jury.  " 'Where the jury is just as competent as the expert to consider and weigh the evidence and draw the necessary conclusions, then the need for expert testimony evaporates.' " (*Ibid.*)

"However, even when the witness qualifies as an expert, he or she does not possess a carte blanche to express any opinion within the area of expertise." (*Jennings v. Palomar Pomerado Health Systems, Inc.* (2003) 114 Cal.App.4th 1108, 1117.)  The trial court should "exclude expert opinion testimony that is (1) based on matter of a type on which an expert may not

reasonably rely, (2) based on reasons unsupported by the material on which the expert relies, or (3) speculative." (*Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 771–772 (*Sargon*); see Evid. Code, § 801, subd. (b).)  In other words, the court must decide "whether the matter relied on can provide a reasonable basis for the opinion or whether that opinion is based on a leap of logic or conjecture." (*Sargon*, at p. 772.)  Of course, a " 'clearly invalid and unreliable' expert opinion" (*ibid*.) has no evidentiary value and is not helpful to the jury.  (*Jennings*, at p. 1117.)

Generally, our courts allow qualified experts to testify about the culture, habits, psychology, and sociology of criminal street gangs.  (*People v. Gonzalez* (2006) 38 Cal.4th 932, 944; see also *People v. Killebrew* (2002) 103 Cal.App.4th 644, 657 (*Killebrew*) [examples include the size and composition of a gang; turf or territory; an individual's membership in, or association with, a gang; the primary activities of a specific gang; the motivation for a particular crime; whether and how a crime benefitted a gang; rivalries; tattoos, graffiti, signs, and colors].)  The Supreme Court has also approved asking an expert a hypothetical question that closely track the facts of the case on trial.  (*People v. Vang* (2011) 52 Cal.4th 1038, 1041 (*Vang*).)

Whether an expert can give an opinion regarding the actual defendant on trial depends, again, on whether it would assist the jury.  (*Vang*, *supra*, 52 Cal.4th at pp. 1048, 1052.)  In most cases, such testimony is *not* helpful. (See, e.g., *Killebrew*, *supra*, 103 Cal.App.4th at p. 652 [improper for expert to testify "when one gang member in a car possesses a gun, every other member in the car knows of the gun and constructively possess the gun"]; but see *People v. Valdez* (1997) 58 Cal.App.4th 494, 508–509 [proper for expert to testify that defendants acted for the benefit of their respective gangs "[g]iven the unique facts" involving a caravan of several gangs that "united for one

14

day to attack Sureños"]; see also *Vang*, at p. 1048, fn. 4 ["It appears that in some circumstances, expert testimony regarding the specific defendants might be proper"].) This is because the jury is usually as competent as the expert to weigh the evidence and draw conclusions. (*Id.* at p. 1048.) An expert opinion on the mental state of a specific defendant may be speculative as well. (See, e.g., *People v. Perez* (2017) 18 Cal.App.5th 598, 613–614 [opinion that defendant shot a gun at a party with the specific intent to promote, further, or assist gang members was "unsubstantiated" where the evidence only showed that he had one nonvisible gang tattoo].)

"The trial court has broad discretion in deciding whether to admit or exclude expert testimony" and we review its decision for abuse of discretion. (*People v. McDowell* (2012) 54 Cal.4th 395, 426.) "A ruling that constitutes an abuse of discretion has been described as one that is 'so irrational or arbitrary that no reasonable person could agree with it.' " (*Sargon, supra*, 55 Cal.4th at p. 773.) "But the court's discretion is not unlimited . . . . [I]t must be exercised within the confines of the applicable legal principles." (*Ibid.*)

Here, we disagree with the Attorney General that Hansel did not express an opinion regarding Corbi specifically. The prosecutor asked Hansel to clarify " 'the significance of *the defendant* who we've talked about' " following Orozco. Hansel testified that he "personally found that strange" and questioned why anyone would follow an ESD member in their own turf. He added, "I think something pissed *him* off, and *he* decided to follow." (Italics added.) Contrary to the Attorney General's suggestion, this testimony is not fairly interpreted as explaining how someone *in Corbi's position* would be expected to respond in a similar situation. It is Hansel

opining on what *Corbi* was or could have been thinking when he followed Orozco.

The prosecutor then proceeded to give Hansel the hypothetical "where an Eastside gang member in Eastside territory has confronted another individual and has walked away from them, and that individual follows him." The prosecutor asked what "an Eastside gang member" would do "in a situation like this," and Hansel answered that the ESD member "would have to address that." We agree with the Attorney General that, here, Hansel appropriately explained how a typical Eastsider would respond to someone following them, based on a hypothetical closely tracking the facts in this case. (See *Vang*, *supra*, 52 Cal.4th at p. 1041.) However, the Attorney General fails to appreciate that the prosecutor then departed from the hypothetical and asked Hansel about Corbi and Orozco specifically: "Would you agree in this situation that *the defendant* has started a quarrel *with Orozco*?" (Italics added.) Hansel agreed. Asking Hansel about "the defendant" can only be understood as eliciting an opinion on Corbi himself.

Although we accept Corbi's premise that Hansel rendered an opinion about him specifically, we cannot say " 'that no reasonable person could agree with' " the trial court's ruling that this testimony was not speculative. (*Sargon*, *supra*, 55 Cal.4th at p. 773.) It is undisputed that Hansel was an expert on the culture and habits of ESD and MDLS members. Based on his experience, he knew these were rival gangs and that Orozco was a confirmed ESD member. He also fairly suspected Corbi of involvement with MDLS based on his tattoo and social media. In watching the smart streetlight video, Hansel recognized Orozco throwing ESD signs with his hands during the initial confrontation with Corbi. Multiple witnesses testified that the two men appeared to be arguing. And, obviously, Corbi shot Orozco several

16

times. Based on this evidence, it does not require a "leap of logic" to infer that Corbi was "pissed off" when he followed Orozco. (*Id*. at p. 772.) We appreciate that Hansel cannot read Corbi's mind. But evidence of a defendant's mental state "is rarely susceptible of direct proof and usually must be inferred from the facts and circumstances surrounding the offense." (*People v. Pre* (2004) 117 Cal.App.4th 413, 420.)

Likewise, we do not think it was a leap of logic for Hansel to opine that Corbi started a quarrel with Orozco by following him. Based on his training and experience, he explained that an individual following an ESD member in their territory would be considered disrespectful and confrontational. The defense gang expert, Mortera, also testified that an average gang member who was followed as Orozco was would "[g]et ready to fight." Because Hansel knew that Orozco was an ESD member, the shooting occurred in ESD territory, and the video showed Corbi following him, it was rational to infer that Corbi started a quarrel.

Nevertheless, we agree with Corbi that this testimony was not helpful to the jury. It simply does not require special knowledge or experience to infer that someone who shoots another person several times might be "pissed off." (See Evid. Code, § 801, subd. (a).) And while it was useful for the experts to explain how a gang member would react to being followed in their own territory—with "a confrontation" or "a fight"—Hansel was in no better position than the jury to apply this information to this case and decide whether Corbi in fact started a quarrel with Orozco by following him in ESD territory. (See *Vang*, *supra*, 52 Cal.4th at p. 1048.)

In any event, we see no reasonable probability that Corbi would have achieved a better result—a voluntary manslaughter conviction or acquittal—had Hansel not given these two opinions. (See *Burton v. Sanner* (2012) 207

17

Cal.App.4th 12, 22 (*Burton*) [the erroneous admission of expert testimony requires reversal "only if ' "it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error' " ' "].) We appreciate that, because Corbi claimed self-defense and imperfect self-defense, it was important for the jury to decide whether he actually believed the use of deadly force was necessary to defend himself from imminent threat of death or great bodily injury. (*People v. Sotelo-Urena* (2016) 4 Cal.App.5th 732, 744; see also *ibid.* [" 'The subjective elements of self-defense and imperfect self-defense are identical' "].) But we are not convinced that Hansel's testimony—that he believed " 'something pissed [Corbi] off' "—would have caused jurors "to discount Corbi's position." Even assuming the jurors accepted that Corbi followed Orozco because he felt angry, this would not preclude them from finding that he believed deadly force was necessary to protect himself when Orozco emerged from the alcove raising his hands and puffing his chest. (See *People v. Trevino* (1988) 200 Cal.App.3d 874, 879 ["if the only causation of the killing was the reasonable fear that there was imminent danger of death or great bodily injury, then the use of deadly force in self-defense is proper, regardless of what other emotions the party who kills may have been feeling, but not acting upon"].)

We also recognize that it was critical for the jury to decide whether Corbi started a quarrel because "[a] person does not have the right to self-defense if he or she provokes a fight or quarrel with the intent to create an excuse to use force." (CALCRIM No. 3472; accord, *People v. Enraca* (2012) 53 Cal.4th 735, 761–762.) But again, even if the jurors accepted Hansel's opinion that Corbi started a quarrel with Orozco by following him, this does not mean they could not find he shot in self-defense. To lose the right to self-defense, a defendant must start a quarrel *with the intent to create an excuse*

18

*to use force.* Hansel's opinion, which focused on how *an ESD member would respond* to being followed, had no clear bearing on this latter point.

Viewing this case holistically, we discern no reasonable chance that these two bits of testimony persuaded the jury to reject the claims of self-defense and imperfect self-defense in convicting Corbi of murder. Hansel gave just one interpretation of the fact that Corbi followed Orozco. As the trial court instructed, the jury was not required to accept his opinion as true or correct. Instead, they were free to "disregard any opinion that [they found] unbelievable, unreasonable, or unsupported by the evidence." (CALCRIM No. 332.)

Indeed, the jury also heard Corbi's version of events. He testified that Orozco initiated the encounter and instructed Corbi to follow him. Although Corbi was afraid, he decided that running away would be futile because Orozco could chase him and attack him. His account was bolstered by Dr. Malek, who opined that Corbi's fear was "legitimate" in this case, and Mortera, who agreed it was possible that Corbi was afraid when he followed Orozco and that walking away would have been "fruitless." In addition, the smart streetlight video was played for the jurors several times at trial and admitted into evidence for their review. On this record, there is no real danger that the jury simply adopted Hansel's opinions. (Cf. *Burton, supra,* 207 Cal.App.4th at p. 24 [reversing where "[s]ubstantial danger exist[ed] that the jury simply adopted [the expert's] unrefuted opinions rather than drawing its own"].) The jury was given multiple perspectives—from experts on both sides, from Corbi himself, and from the surveillance video—to weigh and consider in drawing its own conclusions.

Finally, in the event we concluded that Hansel's testimony was properly admitted, Corbi alternatively claims the trial court erred when it did

19

not allow Mortera to opine whether Corbi feared for his life. Specifically, toward the end of direct examination, defense counsel asked Mortera: "Based on your training and experience, your review of the discovery in this case, do you believe that Mr. Corbi was in fear for his life when he was approached by Mr. Orozco on August 2nd?" The prosecutor objected based on speculation, and the court sustained the objection.

Since we did not treat Hansel's opinions as properly admitted, we need not reach this alternative claim. We note, however, that any assumed error would be harmless since Mortera gave nearly the same opinion elsewhere in his testimony. As noted earlier, on cross-examination the prosecutor asked Mortera if following Orozco was "the action of somebody afraid of ESD" and Mortera replied, "Possibly." Moreover, Dr. Malek concurred that Corbi's fear was legitimate. Thus, we disagree with Corbi that the jury was left with "only one side's conclusion on" the "critical issue" of whether he was "pissed off" or fearful when he followed Orozco. In sum, there is no reversible error arising from the expert testimony in this case.

## B. *Corbi did not preserve his Racial Justice Act claim for appeal.*

Corbi, who is Mexican-American, contends that the prosecutor violated the California Racial Justice Act of 2020 (RJA) during closing arguments by referencing his interest in white women.

### 1. *Additional Background*

As discussed above, the prosecution presented photos and messages from the Facebook profile that Corbi created after the shooting. In the photo at issue here, Corbi is shown making the letter "D" with his hand. The photo is captioned: "Papas n beer OMW #holla at wueritas[.]" Before trial, the prosecutor suggested the photo was relevant to show flight after a crime— and thus consciousness of guilt—since Papas & Beer was "a famous cantina

20

down in" Mexico. Defense counsel initially objected to all of the Facebook evidence on foundation grounds, but ultimately agreed that the detectives who arrested Corbi could identify him in the photos. She did not ask to exclude the photo or redact any portion of the caption under the RJA.

The photo was discussed a few times at trial. The lead detective confirmed that he took a screenshot of the photo from the "QK MDLS Adams Avenue" profile and identified Corbi in the picture. He read the caption out loud for the jury, and testified that he understood "wueritas" to mean "white girls." Detective Hansel opined that the letter "D" could be a gang sign for MDLS. And on cross-examination, Corbi agreed that he took this picture and posted it when he was in Mexico after the shooting. He acknowledged he did not look remorseful in the photo. Defense counsel did not object to the photo or the translation at trial.

In closing, the prosecutor referenced the Facebook evidence in arguing that Corbi's behavior after the shooting showed a lack of remorse:

> "But this is the guy who came in here and told you the sympathetic story about his upbringing and about how his learning disabilities make him make bad decisions. *Now, this guy headed down to Mexico, started drinking at Papas & Beer, wondering where all the white ladies were at.* [¶] But the aftermath of this case is important. We see him gang banging on the internet. We see the threats. We see the name changing. All of which are important. This gang member defendant. This was taken after the shooting by his own admissions. Not very remorseful. Throwing MDLS gang signs, posting it on public pages. More gang signs, more gangster. *'Papas & Beer, on my way. Holla at the white women.'* This is the no remorse. This is the defendant outside this courtroom. The one proud to represent his gang set. Proud to change his name to Queso Killer. Proud to represent Adams Avenue. Flashing gang signs, having a pretty good time. . . . Calling out[,] 'Where my CheexSer hoexs at?' This is murder. This is somebody

21

proud of what he did. Not somebody that it was him or me." (Italics added.)

Then, towards the end of his argument, the prosecutor again referenced the Facebook evidence in characterizing Corbi's actions as brazen:

> "It's nice in a murder trial to see that the People's gang expert and one of the defendant's own witnesses can agree about something. It has to do with the brazen acts of the defendant. We've talked about how going into ESD territory in and of itself, if you're claiming to kick it with MDLS, is a brazen act. To do so at 2:30 in the afternoon, packing heat in a jacket, even more so. Bragging about being a queso killer on Facebook is a brazen act because you're asking for retaliation. You're saying[,] 'I'm the queso killer, bring it ESD.' This is not someone so afraid of ESD that it was him or me. Shooting someone dead in the street, going on a holiday in Mexcio, *drinking at Papas & Beer, looking for white women, brazen.* Changing your screen name to Queso Killer, brazen." (Italics added.)

When the prosecutor completed his closing argument, the trial court excused the jury for a 15 minute break. Outside the presence of the jury, the court and counsel had an unreported discussion. Defense counsel then memorialized some or all of the discussion for the record:

> "During the Prosecution's closing argument, I believe that there were certain comments that were improper. There were comments about the Defense trying to get him off. He made a comment about Mr. Corbi trying to get at white women. And he called Mr. Corbi a gangster. I believe that those arguments were improper. That he's saying those things to inflame the passions of the jury, and I just want that to be noted."

In response, the prosecutor addressed his use of the term "gangster" only. The court then expressed its views:

22

> "Here's the way I look at it, and you can respond if you wish. I think the comment – the insinuating that it's the job of a defense attorney to get him off is an improper comment.
>
> "I don't think the white women is an improper comment because I believe there's something on one of those things – it's in Spanish indicating that's a white woman. I mean, it's there. Whether it should be argued or not is something else, but it's there.
>
> "Gangster or gang member, I think is not so different that I would prohibit the prosecutor from saying 'gang member' or 'gangster,' either one.
>
> "Any comment or disagreement with that by the defense? Obviously, you don't agree with all of it."

Defense counsel replied: "Correct, your Honor. I would just hope that in rebuttal that there isn't another comment about trying to get my client off." The court did not expect any such comments. The jury returned to the courtroom and counsel gave her closing argument. On rebuttal, the prosecutor did not mention "white women" again.

2. *The California Racial Justice Act of 2020*

The RJA, which took effect January 1, 2021, provides that "[t]he state shall not seek or obtain a criminal conviction or seek, obtain, or impose a sentence on the basis of race, ethnicity, or national origin." (§ 745, subd. (a).)

The RJA was passed with the express intent "to eliminate racial bias from California's criminal justice system" and "to ensure that race plays no role at all in seeking or obtaining convictions or in sentencing." (Assem. Bill No. 2542 (2019–2020 Reg. Sess.) § 2, subd. (i).) The Legislature's goal was "to provide remedies that will eliminate racially discriminatory practices in the criminal justice system, in addition to intentional discrimination." (*Id.*, § 2, subd. (j).) The Legislature recognized that "[i]mplicit bias, although often

23

unintentional and unconscious, may inject racism and unfairness into proceedings similar to intentional bias" and specified that its intent was "not to punish this type of bias, but rather to remedy the harm to the defendant's case and to the integrity of the judicial system." (*Id.*, § 2, subd. (i).)

The RJA specifies four categories of conduct, any one of which, if proven by a preponderance of the evidence, establishes a violation. (§ 745, subd. (a)(1)–(4).) As relevant here, a violation occurs when, "[d]uring the defendant's trial, in court and during the proceedings . . . an attorney in the case . . . used racially discriminatory language about the defendant's race, ethnicity, or national origin, or otherwise exhibited bias or animus towards the defendant because of the defendant's race, ethnicity, or national origin, whether or not purposeful." (*Id.*, subd. (a)(2).) However, "[t]his paragraph does not apply if the person speaking is relating language used by another that is relevant to the case or if the person speaking is giving a racially neutral and unbiased physical description of the suspect." (*Ibid.*)

In turn, the statute defines "[r]acially discriminatory language" as "language that, to an objective observer, explicitly or implicitly appeals to racial bias, including, but not limited to, racially charged or racially coded language, language that compares the defendant to an animal, or language that references the defendant's physical appearance, culture, ethnicity, or national origin." (§ 745, subd. (h)(4).) "Evidence that particular words or images are used exclusively or disproportionately in cases where the defendant is of a specific race, ethnicity, or national origin is relevant to determining whether language is discriminatory." (*Ibid.*)

3.      *Corbi forfeited his RJA claim by failing to raise it below.*

Corbi argues that the prosecutor's remarks about his interest in white women were racially discriminatory under the RJA because they "primed implicit bias of jurors about interracial relationships in general, and about stereotypes of men-of-color seeking out white women for sex in a predatory manner in particular."  While his Facebook photo used the phrase "holla at wueritas," Corbi points out that the prosecutor took liberties with the photo's caption—suggesting he was "wondering where all the white ladies were at" and "looking for white women"—and, in any event, his interest in white women was wholly irrelevant to the shooting at issue.  Moreover, making these remarks in the context of arguing that he was brazen and unremorseful amplified their discriminatory effect.

The Attorney General argues that Corbi forfeited his claim because he failed to bring a motion under the RJA in the trial court.  He further contends the claim fails on the merits because the prosecutor simply related language that Corbi used in his Facebook photo, and the photo was "relevant to counter the defense narrative that [Corbi] lived in fear of the Eastsiders, killed out of self-defense, and was remorseful for taking Orozco's life."

Corbi's point is well taken, but we agree with the Attorney General that he failed to preserve his claim for direct appeal.

In its initial form, the RJA stated that "[a] defendant may file a motion in the trial court or, if judgment has been imposed, may file a petition for writ of habeas corpus or a motion under Section 1473.7 in a court of competent jurisdiction, alleging a violation of subdivision (a)."  (Stats. 2020, ch. 317 (Assem. Bill No. 2542) § 3.5, eff. Jan. 1, 2021; § 745, subd. (b).)  This language created a question of whether, postjudgment, an RJA claim could *only* be

25

pursued via habeas petition or section 1473.7 motion, i.e., not on direct appeal. (See *People v. Lashon* (2024) 98 Cal.App.5th 804, 811–812 (*Lashon*).)

The Legislature responded three years later with Assembly Bill No. 1118 (2023–2024 Reg. Sess.) which, effective January 1, 2024, amended section 745, subdivision (b) to state, in relevant part: "A defendant may file a motion pursuant to this section, or a petition for writ of habeas corpus or a motion under Section 1473.7, in a court of competent jurisdiction, alleging a violation of subdivision (a). For claims based on the trial record, a defendant may raise a claim alleging a violation of subdivision (a) on direct appeal from the conviction or sentence. The defendant may also move to stay the appeal and request remand to the superior court to file a motion pursuant to this section."[2]

The question then became whether a defendant could raise an RJA claim *for the first time* on direct appeal. In *Lashon*, *supra*, 98 Cal.App.5th 804, the First Appellate District, Division Three answered this question in the negative, concluding that "long-standing procedural appellate rules governing forfeiture of issues continue to apply" in this context. (*Id.* at p. 809.) Accordingly, a defendant may be found to have forfeited an RJA claim made for the first time on direct appeal absent a showing that some exception to the forfeiture doctrine applies. (*Id.* at p. 815.)

To reach that conclusion, the *Lashon* court first analyzed the language of section 745. Although section 745, subdivision (b) now expressly permits a defendant "to raise a claim alleging a violation of subdivision (a) on direct appeal," the appellate court emphasized that the statute does *not* say that defendants may raise such claims *for the first time* on direct appeal. (*Lashon*,

---

[2]     The Supreme Court recently discussed how a defendant may establish good cause for a stay and remand under the RJA. (*People v. Wilson* (2024) 16 Cal.5th 874, 943–962.) Corbi did not seek a stay and remand in this court.

*supra*, 98 Cal.App.5th at p. 812.) Absent such language, the court concluded that "review of a section 745 claim, like any other appellate claim, is subject to the general appellate rules of preservation and forfeiture of claims that could have been but were not made in the trial court." (*Ibid.*; see also *Hayes v. Temecula Valley Unified School Dist.* (2018) 21 Cal.App.5th 735, 748 ["Appellate courts may not add provisions to a statute or rewrite it to conform to an asserted 'intent that does not appear from its plain language' "].)

The court found support for its interpretation in other parts of section 745—notably, subdivision (c). (*Lashon, supra*, 98 Cal.App.5th at pp. 812– 813.) That provision currently provides: "If a motion is filed in the trial court and the defendant makes a prima facie showing of a violation of subdivision (a), the trial court shall hold a hearing. A motion made at trial shall be made as soon as practicable upon the defendant learning of the alleged violation. *A motion that is not timely may be deemed waived, in the discretion of the court.*" (§ 745, subd. (c), italics added.) Subdivision (c) goes on to describe the evidence that may be presented at the hearing, the burden of proof, and the requirement for the court to make its findings on the record. (*Id.*, subd. (c)(1)–(3).)

The *Lashon* court opined it would not make sense "for the Legislature to prescribe a comprehensive procedure for making and adjudicating a section 745 motion at the trial level (including a specific waiver provision for untimely motions), only to allow defendants who could have but did not use that procedure (thereby preserving their claim for review) to bypass that procedure and pursue a section 745 claim for the first time on direct appeal." (*Lashon, supra*, 98 Cal.App.5th at p. 813; accord *People v. Singh* (2024) 103 Cal.App.5th 76, 115 (*Singh*) ["To permit a defendant to raise a claim on direct appeal where, as here, he could have but failed to timely raise it at trial

27

would render the timeliness requirement set forth in section 745, subdivision (c) meaningless because, even if such a claim was not timely raised below, it could be raised for the first time on appeal"].)  The court also considered the waiver provision to be "consistent with the basic rationale of the forfeiture doctrine—i.e., ' " ' "to encourage a defendant to bring errors to the attention of the trial court, so they may be corrected or avoided and a fair trial had." ' " ' "  (*Lashon*, at p. 813, quoting *People v. Simon* (2001) 25 Cal.4th 1082, 1103 (*Simon*).)

To the extent section 745 was ambiguous, the *Lashon* court also examined the legislative history of Assembly Bill No. 1118 and confirmed that the Legislature did not intend to allow defendants to pursue RJA claims for the first time on direct appeal.  (*Lashon*, *supra*, 98 Cal.App.5th at p. 813.)  An analysis from the Assembly Committee on Public Safety was particularly illuminating.  There, the committee explained in critical part:

> "This bill would make additional clarifying changes to the CRJA.  It would specify that a CRJA claim based on the trial record may be raised on direct appeal from the conviction or sentence, not just in a habeas petition.  (*In re Carpenter* (1995) 9 Cal.4th 634, 646 ["Appellate jurisdiction is limited to the four corners of the record on appeal[ ]"].)  This bill would also clarify that the defendant/appellant may move to stay the appeal and request remand to the superior court to file a CRJA motion.  This may be necessary to permit the trial court to rule on the claim in the first instance, and to allow the parties to fully litigate the issue.  (See *Gray1 CPB, LLC v. SCC Acquisitions, Inc.* (2015) 233 Cal.App.4th 882, 897 ["[I]t is fundamental that a reviewing court will ordinarily not consider claims made for the first time on appeal which could have been but were not presented to the trial court.  Thus, we ignore arguments, authority and facts not presented and litigated in the trial court"] (citation and quotations omitted); see also *People v. Welch* (1993) 5 Cal.4th 228, 237 ["Reviewing courts have traditionally excused parties for failing to raise an issue at

28

trial where an objection would have been futile or wholly unsupported by substantive law then in existence"].)" (Assem. Com. Public Saf., com. on Assem. Bill No. 1118 (2023–2024 Reg. Sess.) as amended Mar. 15, 2023, pp. 5–6 (Assembly Public Safety comment).)

Since this discussion indicated that the Legislature was aware of the general rules of preservation and forfeiture of issues on appeal, the *Lashon* court could not attribute the absence of language allowing defendants to raise RJA claims *for the first time* on direct appeal to mere inadvertence. (*Lashon, supra,* 98 Cal.App.5th at pp. 813–814.) To the contrary, the omission in light of this discussion "strongly suggest[ed] the Legislature intended to leave the issues of preservation and forfeiture of claims on direct appeal to be resolved by the courts based on long-standing procedural canons." (*Id.* at p. 814.)

We agree with this analysis. Corbi raises several arguments urging us to depart from *Lashon,* but none are persuasive. As we understand it, his main argument is that the clause "[f]or claims based on the trial record" in section 745, subdivision (b) means that claims based *exclusively* on the record—in his view, subdivision (a)(2) claims—are not subject to forfeiture because they "rise and fall entirely on an assessment of what is in the record—for example, in this case, an assessment of the prosecutor's statements during closing argument." By contrast, "disparate enforcement" claims—under subdivision (a)(1), (3), or (4)—must be preserved in the trial

court via motion because they require "an evidentiary hearing or additional factual development."[3]

Corbi's argument runs afoul of the plain language of section 745, which prescribes the same procedures for raising a claim under any subpart of subdivision (a).  (See § 745, subd. (b) ["A defendant may file a motion pursuant to this section, or a petition for writ of habeas corpus or a motion under Section 1473.7, in a court of competent jurisdiction, alleging a violation of [section 745,] *subdivision (a).*  For claims based on the trial record, a defendant may raise a claim alleging a violation of *subdivision (a)* on direct appeal from the conviction or sentence" (italics added)]; § 745, subd. (c) ["If a motion is filed in the trial court and the defendant makes a prima facie showing of a violation of *subdivision (a)*, the trial court shall hold a hearing" (italics added)]; *id.*, subd. (c)(2) ["The defendant shall have the burden of proving a violation of *subdivision (a)* by a preponderance of the evidence" (italics added)].)  Indeed, the defendant in *Lashon*, like Corbi in this case, was pursuing a section 745, subdivision (a)(2) claim.  (See *Lashon*, *supra*, 98 Cal.App.5th at pp. 809–810.)

Moreover, his argument assumes that forfeiture only concerns whether the claim raised on appeal is supported by the trial record.  As we have

_____

3      Under section 745, subdivision (a)(1), a violation is established if the defendant proves, by a preponderance of the evidence, that "[t]he judge, an attorney in the case, a law enforcement officer involved in the case, an expert witness, or juror exhibited bias or animus towards the defendant because of the defendant's race, ethnicity, or national origin."  A subdivision (a)(3) violation is established if "[t]he defendant was charged or convicted of a more serious offense than defendants of other races, ethnicities, or national origins," and an (a)(4) violation occurs when "[a] longer or more severe sentence was imposed on the defendant than was imposed on other similarly situated individuals convicted of the same offense . . . ."  (§ 745, subd. (a)(3)– (4).)

30

already noted, however, "the basic rationale of the forfeiture doctrine" is to encourage defendants " ' " 'to bring errors to the attention of the trial court, so that they may be corrected or avoided and a fair trial had . . . .' " ' " (*Simon, supra*, 25 Cal.4th at p. 1103; see also *People v. Partida* (2005) 37 Cal.4th 428, 434 (*Partida*) [a specific objection " 'serves to prevent error' " and " 'avoid possible prejudice' "].)  Here, had defense counsel presented the RJA claim to the trial court as soon as practicable, the defense could have pursued "a remedy specific to the violation" much sooner—even before the jury began deliberations.  (See § 745, subd. (e).)

In light of the relevant legislative history, we believe the Legislature included the phrase "[f]or claims based on the trial record" to acknowledge that appeals, as opposed to habeas petitions or section 1473.7 motions, are " 'limited to the four corners of the record.' "  (Assem. Public Saf. com., *supra,* at p. 5, quoting *In re Carpenter* (1995) 9 Cal.4th 634, 646.)  We do not read this clause to mean that certain RJA claims are not forfeitable.

Corbi further asserts that following the reasoning of *Lashon* would result in "mass forfeiture of an entire category of RJA claims—those in which the defendant's own attorney used racially discriminatory language or otherwise exhibited racial animus toward the defendant"—because an attorney certainly would not object to their own biased remarks.  But we read *Lashon* merely to hold that a defendant forfeits an RJA argument that *could*

*have been raised in the trial court* but was not. Forfeiture is not appropriate where a defendant has no reasonable means of making the argument.[4]

We appreciate that the overall purpose of the RJA is to eliminate racial bias from our justice system "because racism in any form or amount, at any stage of a criminal trial, is intolerable . . . ." (Assem. Bill No. 2542 (2019–2020 Reg. Sess.) § 2, subd. (i).) But at the same time, we must also account for the fact that, in enacting Assembly Bill No. 1118, the Legislature intended "to ensure RJA claims are processed more efficiently and that the intent of the law is followed." (Assem. Public Saf. com*., supra,* at pp. 4–5.) As the Fifth Appellate District observed in *Singh, supra,* 103 Cal.App.5th at page 115, "[p]ermitting an [RJA] claim to be raised on direct appeal for *the first time* when it could have been timely raised and remedied below would be directly contrary to the goal of promoting judicial efficiency." And if the Legislature had intended for RJA claims to be decided on their merits whenever raised, it would not have required RJA motions to be "made as soon as practicable upon the defendant learning of the alleged violation" and given courts the discretion to deem untimely motions waived. (§ 745, subd. (c).)

In any event, relying on *People v. Hubbard* (2020) 52 Cal.App.5th 555 (*Hubbard*), Corbi insists that his RJA claim was preserved because his trial counsel raised a timely objection to the prosecutor's comments. In *Hubbard,* the defendant argued on appeal that the prosecutor committed misconduct by

---

[4] Moreover, at least one published case suggests a way in which such a claim might be raised in the trial court, at least in some circumstances. In *People v. Coleman* (2024) 98 Cal.App.5th 709, the defendant made an oral *Marsden* motion alleging ineffective assistance of counsel on multiple grounds, including that his attorney advised him to " 'use Ebonics, slang, and to sound ghetto' " when he testified. (*Coleman,* at pp. 717–718.) The trial court appointed new counsel to investigate a potential motion for new trial. (*Id.* at p. 718.) Ultimately, the substitute counsel did not assert a claim under the RJA before sentencing, but presumably could have. (*Ibid.*)

32

commenting on his failure to testify, in violation of *Griffin v. California* (1965) 380 U.S. 609 (*Griffin*). (*Hubbard*, at p. 560.) The high court in *Griffin* specifically held that such remarks offend the self-incrimination clause of the Fifth Amendment. (*Griffin*, at pp. 611–615; see also *Hubbard*, at p. 563.)

The Attorney General in *Hubbard* asserted that the defendant forfeited his claim by not timely objecting based on federal constitutional error. (*Hubbard, supra*, 52 Cal.App.5th at p. 562.) The Third Appellate District disagreed. Defense counsel objected immediately after the conclusion of the prosecutor's argument, contending that he "made 'an improper argument' by highlighting that [the defendant] did not testify and implying that he should have testified to support his trial counsel's version of the events." (*Id.* at pp. 561, 563.) The appellate court considered this objection to be timely and sufficient. (*Ibid.*)

Here, once the prosecutor concluded his closing argument, defense counsel stated that she believed the prosecutor's "comments about the [d]efense trying to get him off," "Corbi trying to get at white women," and calling him "a gangster" were "improper" and designed to "inflame the passions of the jury . . . ." When the trial court shared its perspective on the "white women" reference—"I don't think [it] is an improper comment because I believe there's something on one of those things – it's in Spanish indicating that's a white woman"—counsel did not press the issue further, even though the court invited counsel to respond, comment, or disagree. We would likely consider this objection timely and sufficient to preserve a claim of prosecutorial error. (See, e.g., *People v. Seumanu* (2015) 61 Cal.4th 1293, 1342 [it is improper for the prosecutor "to appeal to the passions and prejudices of the jury" during argument].)

It is insufficient, however, to preserve the claim that Corbi attempts to raise now—i.e., that the prosecutor's remarks violated the RJA, a distinct statutory scheme with enumerated procedures and remedies. The objection in *Hubbard* described the substance of a *Griffin* violation. The objection here—collectively flagging three separate comments from the prosecutor as improper and inflammatory—was not specific enough to alert the court that it was being called upon to decide whether the references to white women constituted "racially discriminatory language" within the meaning of section 745, subdivision (a)(2) by appealing to implicit biases about interracial relationships. On this point, Corbi further asserts that the RJA does not require a "formal motion" and an oral objection is sufficient. Even accepting this premise, the problem is that counsel's oral objection did not mention the RJA or otherwise articulate a claim under section 745. (See *People v. Fruits* (2016) 247 Cal.App.4th 188, 208 ["a party cannot argue on appeal that the trial court erred in failing to conduct an analysis it was not asked to conduct"]; *People v. Fuiava* (2012) 53 Cal.4th 622, 655 ["A defendant ordinarily cannot obtain appellate relief based upon grounds that the trial court might have addressed had the defendant availed him or herself of the opportunity to bring them to that court's attention"].)

In his reply brief, Corbi argues for the first time that his trial counsel rendered ineffective assistance by failing to raise the RJA claim. "It is rarely appropriate," however, "to resolve an ineffective assistance claim on direct appeal" and as a matter of fairness "we certainly will not do so where, as here, the claim is omitted from the opening brief and thus waived." (*People v. Duff* (2014) 58 Cal.4th 527, 550, fn. 9.) Usually, claims of ineffective assistance of counsel are more appropriately raised on habeas corpus. (*People v. Mendoza Tello* (1997) 15 Cal.4th 264 266–267.) We express no

opinion on whether Corbi should pursue his claim(s) by means of a habeas petition.

**C.**    ***The trial court properly imposed the firearm enhancement.***

As a final argument, Corbi contends the trial court erred by imposing the 10-year firearm enhancement—in addition to the term of 15 years to life for the murder conviction—because under section 1385, subdivision (c)(2)(C), the court did not have authority to impose any enhancement that would result in an aggregate sentence exceeding 20 years.

1.    *Additional Background*

Through counsel, Corbi moved to dismiss the firearm enhancement under section 1385, subdivision (c).  Specifically, he asserted that dismissing the enhancement was in the interest of justice to avoid a discriminatory racial impact upon the Latino community, and because the shooting was connected to mental illness, prior victimization, and childhood trauma.  (*Id.*, subd. (c)(3)(A), (D), & (E).)  Alternatively, Corbi asked the court to impose a lesser enhancement under section 12022.5, subdivision (a).

At the sentencing hearing, the prosecutor asserted that dismissing the firearm enhancement would endanger public safety.  He emphasized Corbi's "callousness in procuring the firearm, using it that day, bragging about the shooting and even having the audacity to tag up his holding cell with '187 shot'."  He characterized the offense—"hunt[ing] down Lazaro Orozco at 2:30 in the afternoon" and "follow[ing] him to his death"—as a "heinous" and "brazen" crime that Corbi showed no remorse for.

In response, defense counsel reminded the court that, before this incident, Corbi had no criminal record, and the trauma he endured at the hands of gang members in his community led "to the impetuosity and the failure to appreciate the risk in carrying a handgun, as was testified to by

35

Dr. Malek in this particular case." Counsel reiterated her request for the court to strike the firearm enhancement completely, or at least impose a lesser enhancement under section 12022.5, subdivision (a), based on Corbi's mental health, prior victimization, and childhood trauma.

The trial court agreed that imposing 25 years to life under section 12022.53, subdivision (d) was not warranted "for the reasons mentioned in the defense papers . . . ." Looking at "the entire situation," the court decided that 10 years under section 12022.53, subdivision (b), was "the appropriate punishment." As the court explained, while Orozco "was intending maybe to fight" Corbi, "he certainly didn't ask that the weapon be used" against him. Nevertheless, the court accepted that Corbi actually, albeit mistakenly and unreasonably, believed that his actions were legal. It also highlighted that he had "no criminal record whatsoever" despite being raised with "absolutely no controls over his behavior" and "a complete loss of parental supervision." The court believed that Corbi was "suffering from a mental condition which significantly reduced his culpability for the crime."

2. *Section 1385, as amended by Senate Bill No. 81, did not require the trial court to dismiss the firearm enhancement altogether.*

"For all criminal sentencings after January 1, 2022, our Legislature in Senate Bill No. 81 (2021–2022 Reg. Sess.) (Stats. 2021, ch. 721, § 1) has provided direction on how trial courts are to exercise their discretion in deciding whether to dismiss sentencing enhancements." (*People v. Walker* (2022) 86 Cal.App.5th 386, 391 (*Walker I*), affd. (2024) 16 Cal.5th 1024 (*Walker II*).) "Specifically, section 1385, subdivision (c)(1) now provides that 'the court shall dismiss an enhancement if it is in the furtherance of justice to do so,' and subdivision (c)(2) states that '[i]n exercising its discretion under this subdivision, the court shall consider and afford great weight to evidence' of nine listed 'mitigating circumstances,' any 'one or more' of which 'weighs

36

greatly in favor of dismissing the enhancement, unless the court finds that dismissal of the enhancement would endanger public safety.' " (*People v. Mazur* (2023) 97 Cal.App.5th 438, 443–444, review granted Feb. 14, 2024, S283229 (*Mazur*).)

"The nine listed 'mitigating circumstances' include factors such as mental illness, prior victimization, childhood trauma, use of an inoperable or unloaded firearm, the defendant's status as a juvenile, and the use of a prior conviction that is over five years old. (§ 1385, subd. (c)(2)(A)–(I).) Two of the mitigating circumstances include 'shall be dismissed' language." (*Mazur*, *supra*, 97 Cal.App.5th at p. 444, review granted.) Section 1385, subdivision (c)(2)(B), not implicated here, applies where "[m]ultiple enhancements are alleged in a single case" and subdivision (c)(2)(C), which Corbi relies on here, refers to situations in which "[t]he application of an enhancement could result in a sentence of over 20 years." Both subdivisions indicate that, in those instances, the enhancements "*shall be dismissed.*" (§ 1385, subd. (c)(2)(B) & (C), italics added.)

Corbi argues that this "shall be dismissed" language means the trial court could not lawfully impose any sentence enhancement that would result in his total sentence exceeding 20 years. But "[o]ther California courts have consistently rejected this mandatory dismissal argument in construing the 'shall be dismissed' language of [section 1385,] subdivision (c)(2)(B) and (C)." (*Mazur*, *supra*, 97 Cal.App.5th at p. 444, review granted, citing *People v. Mendoza* (2023) 88 Cal.App.5th 287, 290–293; *People v. Anderson* (2023) 88 Cal.App.5th 233, 238–240, review granted Apr. 19, 2023, S278786 (*Anderson*); *People v. Lipscomb* (2022) 87 Cal.App.5th 9, 15–21; *Walker I*, *supra*, 86 Cal.App.5th at pp. 391, 395–398.) Our court has agreed with these

cases on this point. (*Mazur*, at p. 444.) We therefore reject Corbi's claim that the court had no discretion to impose the enhancement.[5]

The Attorney General additionally argues that section 1385, subdivision (c)(2)(C) does not require dismissal if the trial court finds that dismissing the enhancement would endanger public safety. Here, he maintains, the court impliedly made that finding. In reply, Corbi asserts that even if the trial court had discretion to impose a sentence exceeding 20 years, remand is required because it "did not give sufficiently 'great weight' to the mitigating circumstance" and did not expressly find that dismissing the firearm enhancement entirely—as opposed to reducing the enhancement—would endanger public safety.

In *Walker II, supra,* 16 Cal.5th 1024, the Supreme Court recently clarified how sentencing courts should exercise their discretion under section 1385, subdivision (c)(2). There, the court disagreed that the mandate to "afford great weight" to certain mitigating circumstances created a rebuttable presumption in favor of dismissal that can *only* be overcome by a finding that dismissal would endanger public safety. (*Walker II,* at p. 1028.) Instead, " 'the ultimate question before the trial court remains whether it is in the furtherance of justice to dismiss an enhancement' [citation] and this 'furtherance of justice' (§ 1385, subd. (c)(1)) inquiry requires a trial court's ongoing exercise of 'discretion' (*id*., subd. (c)(2))." (*Walker II*, at p. 1033.)

The Supreme Court acknowledged that in most cases where the trial court found that dismissing an enhancement would endanger public safety, it would be " 'hard to see how dismissal would further the interests of justice,' notwithstanding the applicability of any mitigating factors identified in

---

[5]    Although acknowledging the "shall be dismissed" argument, the Supreme Court recently declined to express an opinion on it. (See *Walker II, supra,* 16 Cal.5th at p. 1035, fn. 5.)

subdivision (c)(2)." (*Walker II, supra,* 16 Cal.5th at p. 1033.) Conversely, "if the court does not conclude that dismissal would endanger public safety, then mitigating circumstances strongly favor dismissing the enhancement. But ultimately, the court must determine whether dismissal is in furtherance of justice. This means that, absent a danger to public safety, the presence of an enumerated mitigating circumstance will generally result in the dismissal of an enhancement unless the sentencing court finds substantial, credible evidence of countervailing factors that 'may nonetheless neutralize even the great weight of the mitigating circumstance, such that dismissal of the enhancement is not in furtherance of justice.' " (*Id.* at p. 1036.)

In conducting this analysis, courts may consider "circumstances 'long deemed essential to the "furtherance of justice" inquiry.' " (*Walker II, supra,* 16 Cal.5th at p. 1033, citing Cal. Rules of Court,[6] rules 4.421 [aggravating factors] & 4.423 [mitigating factors]; see also *Mazur, supra,* 97 Cal.App.5th at p. 446, review granted [the " 'furtherance of justice' " standard "allows the court to consider factors beyond public safety in exercising its discretion whether to dismiss an enhancement, including the nature and circumstances of the crimes and the defendant's background, character, and prospects"].)

In light of *Walker II,* the fact that the trial court in this case did not expressly find that dismissing the firearm enhancement would endanger public safety does not require a remand for resentencing. Even absent such a finding, the court retained discretion to impose or dismiss the enhancement (16 Cal.5th at p. 1029), in whole or in part. Consistent with the " 'holistic balancing' " approach endorsed in *Walker II,* the trial court here emphasized that it considered "the entire situation" before it.

---

[6]     Further undesignated rules are to the California Rules of Court.

It declined to impose the maximum term of 25 years to life "for the reasons mentioned in the defense papers," which invoked several traditional mitigating factors (rule 4.423) plus three of the "great weight" mitigating circumstances enumerated in section 1385, subdivision (c)(2). The court specifically highlighted that Corbi actually, but mistakenly and unreasonably, believed that his conduct was legal (rule 4.423(a)(7)); his lack of a criminal record (rule 4.423(b)(1)); that he was raised "with a complete loss of parental supervision" (see § 1385, subd. (c)(2)(E)); and that he was suffering from a mental condition that significantly reduced his culpability (§ 1385, subd. (c)(2)(D); rule 4.423(b)(2)).

On the other hand, the court considered the nature and circumstances of the current offense and essentially found that Corbi took the altercation too far: "I think there's some evidence that the victim was intending to maybe fight Mr. Corbi, but he certainly didn't ask that the weapon be used by Mr. Corbi." Upon balancing these circumstances, the court decided that 10 years was "the appropriate punishment."

Corbi does not argue the court abused its discretion in weighing these factors and deciding that justice warranted significantly reducing, but not entirely dismissing, the firearm enhancement. He only appears to argue that the court failed to give *enough* weight to the fact that imposing the 10-year enhancement would cause his total sentence to exceed 20 years. This argument, however, is forfeited since he did not raise it in the trial court. (See *People v. Boyce* (2014) 59 Cal.4th 672, 730.)[7] He otherwise fails to

_____

[7] Because Corbi's primary contention—that the trial court did not have legal authority to impose the firearm enhancement pursuant to section 1385, subdivision (c)(2)(C)—if correct, would result in an unauthorized sentence, we did not reject that argument on forfeiture grounds. (See *Anderson, supra,* 88 Cal.App.5th at p. 239, fn. 7, review granted.)

demonstrate how this factor would have tipped the scales in favor of complete dismissal of the enhancement.  (See *People v. Carmony* (2004) 33 Cal.4th 367, 376 [" ' "[t]he burden is on the party attacking the sentence to clearly show that the sentencing decision was irrational or arbitrary" ' "].)  We therefore see no grounds to remand this case for resentencing.

## DISPOSITION

The judgment is affirmed.


DATO, J.

WE CONCUR:


O'ROURKE, Acting P. J.


BUCHANAN, J.